Tomas **RODRIGUEZ** et al., Petitioners-Appellants,

v.

Clarence **JONES** et al., Respondents-Appellees.

No. 72–2135.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 1973.

---

3. "[A] differential based on any other factor other than sex." See 29 U.S.C. § 206(d) (1) (iv).

G. William Baab, Ed J. Polk, Douglas R. Larson, Frank P. Hernandez, Dallas, Tex., Warren Burnett, Odessa, Tex., for petitioners-appellants.

Henry Wade, Dist. Atty., Gerald Weatherly, Asst. Dist. Atty., Dallas, Tex., Michael N. Buckley, Grand Prairie, Tex., for Jones, Valentine, Barker.

N. Alex Bickley, City Atty., Thomas B. Thorpe, Joseph G. Werner, Asst. City Attys., Jim E. Cowles, Dallas, Tex., for Dyson and Dixon.

Before GOLDBERG, AINSWORTH and INGRAHAM, Circuit Judges.

AINSWORTH, Circuit Judge:

On February 15, 1971, three Dallas County deputy sheriffs were shot and killed in West Dallas, Texas. The suspected killers, Guzman and Lopez, were subsequently apprehended. In the meanwhile, Tomas Rodriguez and his wife were wounded by Texas law officials by gunfire on February 18, 1971, when they forcibly entered the Rodriguez residence in the mistaken belief that Guzman and Lopez, the murder suspects, were on the premises.

As a result of their injuries Tomas and Austraberta Rodriguez and their eight children filed this civil rights complaint for damages under 42 U.S.C. §

1983 [1] against named members of the Dallas Police Department and the Dallas County Sheriff's Office.[2] Trial was held without a jury, and the District Judge entered judgment in favor of defendants. Plaintiffs have appealed, presenting the following issues for review:

1. Whether the Trial Court erred in holding that appellees' forcible entry into the Rodriguez apartment was not an unreasonable entry in violation of appellants' constitutional rights.

2. Whether the Trial Court erred in holding that appellees were excused from the requirements of Vernon's Ann.Texas Code Crim.Proc. Art. 15.25 of announcing their purpose and authority prior to their forcible entry into appellants' residence.

3. Whether the Trial Court erred in holding that appellants were not entitled to damages from appellees as the result of an alleged unreasonable search of appellants' residence which occurred subsequent to the entry herein.

We have examined each of appellants' contentions to determine if the District Court erred, either in its findings or application of the law. We find no error and therefore affirm.

Shortly after the murder on February 15, 1971 of the three deputy sheriffs, arrest warrants were issued for the suspected killers, Guzman and Lopez. Lopez' name was unknown at the time and the warrant authorizing his arrest was in the name of "John Doe." Through the combined efforts of the Dallas Police Department and the office of the Dallas County Sheriff, an intensive search was instituted for the two suspects. Three days subsequent to the murders, Gerald Voyles, a federal narcotics agent, and Guy Rose, a Dallas police officer, received a tip from an informer who said that he had seen Guzman and Lopez that evening in a garage apartment at 4627 San Jacinto Street, in Dallas. He told the officers that if they went to that address they would find the suspects, and agreed to point out the house. Both Rose and Voyles had previously acted on information received from the informant and considered him to be reliable. Some time between 9:30 and 10 p. m. that night Rose, with Voyles in the front seat of the automobile, and the informant in the rear seat, drove to the San Jacinto Street address area. Rose drove slowly past the apartment building, back and forth, three times. Each time the informant pointed out a small garage apartment where he said he had seen Guzman and Lopez that evening. The apartment was located to the rear of a main apartment building. A light was on over the door of the rear apartment, and he said, "It's that apartment where the door is, where the light is on." He further remarked, "They are there. If you hit that place right there, you will get them" and warned, "They have guns, and they are going to kill any policeman that comes after them."

Voyles and Rose returned to the police station at about 10 p. m. The information which they had received from the informant was conveyed to Captain Dixon of the Dallas Police Department and to Clarence Jones, Sheriff of Dallas County. Under the direction of Captain Dixon an elaborate plan was formulated for the arrest of Guzman and Lopez at the garage apartment, including block-

1. 42 U.S.C. § 1983 provides that

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. At the time of the incident, Clarence Jones was Sheriff of Dallas County, Texas. Tom Barker and James M. Valentine were both deputy sheriffs. Frank M. Dyson was Chief of Police of the Dallas Police Department; Robert O. Dixon was a police officer with that department.

ing off of the area, the formation of several teams composed of men from the Dallas Police Department and the Sheriff's Office, who were delegated certain responsibilities for their participation in the plan, and a graphic blackboard description of the location of the apartment and planned interaction of the teams. The plan was put into action and the teams proceeded to their designated posts. At approximately 12:30 p. m. on February 19, 1971, Police Captain Dixon, Police Officer Rose and Deputy Sheriffs Barker and Valentine approached the garage apartment. There is no material dispute among the several parties relative to events and incidents up to this point. In regard to what actually occurred thereafter, however, the testimony of the Rodriguez family and that of the officers is contradictory in some respects. There is no question that the officers had in their possession arrest, but not search, warrants and that gunfire was exchanged between Tomas Rodriguez and Deputy Sheriffs Tom Barker and James Valentine. It is also undisputed that Mr. and Mrs. Rodriguez were wounded during the exchange of gunfire, that a search of the premises was subsequently made, and that the officers did not announce their authority before entering the apartment —that they held arrest warrants, or their purpose—that they were there to arrest the fugitives, prior to entering the Rodriguez premises. What is disputed is the question of who opened fire, whether or not the police identified themselves as police officers before entering, and whether or not appellees conducted the search.

The Rodriguez family lives in a three-room apartment. The two front rooms are used as sleeping rooms; the third is a kitchen. Tomas Rodriguez, with the aid of a Spanish-speaking interpreter, testified that he was awakened by noise which he could not understand. The children were crying and shouting when he got up from the middle room where he had been sleeping and entered the front room. There he saw

Rudy, one of his sons, holding his hands up. He saw what appeared to be fire in the room and described the man at the front door as resembling "bundles." Sitting on the floor was his wife. His arm felt heavy, as if he had been hit, whereupon he picked up a gun from beneath a cushion on a chair in the front room. He returned to the kitchen and fired a shot, at which point he was hit by another shot. He then returned to the front room and may have fired another shot. His son told him, "It's the police, Daddy. He says for you to put your hands up and get rid of and throw the gun down." He said the boy told him to turn around and kneel down, which he did. Someone put handcuffs on him, and about thirty minutes later he was taken to a hospital. He admitted that he understands the English words "open," "door," "police," "stop," "pistol," and "hold it," but that the only sounds he had heard prior to entering the front room were shouts and screams.

Mrs. Rodriguez also testified through an interpreter. She said that she went to sleep at about 10 p. m. She, her husband and the two youngest children were occupying the middle room. She heard a loud noise at the front door, got up to check on the other children and, upon entering the front room, was shot in the lower part of her right leg. Up until this time there were no lights on. The shootings did not last long. She and her husband were taken in the same ambulance to Parkland Hospital. Mrs. Rodriguez is familiar with a few English words. She understands the phrase "open the door" and the word "police." She said that she did not hear the word "police." After she was shot she saw an unidentified man search the house.

Police Captain Dixon of the Dallas Police Department testified that it was the responsibility of the Police Department to assist the Sheriff in his investigation. He was the first to arrive at the Rodriguez apartment. He knocked on the wall several times and called out, "Police—Police Officers—open the door" several times. He then moved to a

stairway at the left of the house leading to an upstairs apartment. He heard no noise from within the house. He knocked and called again from the corner of the building. He then heard others knocking and calling out, "Police, Police, open up." An officer was also shouting in Spanish. He then heard the front door being opened and the words, "Hold it. Hold it. Police officers. Freeze. Hold it." This was followed by two pistol shots and the return fire of two shotguns. From inside the apartment he heard running or shuffling and yelling. Several additional shots came from the right of the apartment. After the shooting subsided, Dixon entered the apartment. A subsequent investigation revealed that no person from the Dallas Police Department had discharged any firearms that night at the Rodriguez residence.

Deputy Sheriffs Tom Barker and James Valentine arrived shortly after Captain Dixon. They were both members of a team designated to enter the residence and effect the arrest of the fugitives. Barker testified that on his arrival he heard Captain Dixon knocking on the wall to the left of the house and calling, "Police, come to the door." Barker observed a light go on, then off, inside the apartment. He unlatched the screen door and knocked on the wooden door. Shortly thereafter he heard sounds resembling walking or shuffling and low-spoken Spanish. He kicked the door in. When asked if he had been refused entry, he said, "Well, I had the impression I was being ignored. There was plenty of knocking. There was plenty of hollering. There was plenty of notification. There was plenty of time elapsed. In my opinion, I was being refused not only entry, but being refused the opportunity to be confronted by someone within that apartment." He said that he had knocked at the front door a couple of minutes before kicking it in. He turned on the light switch to the right of the door and Tomas Rodriguez appeared in the doorway between the first and second rooms. Barker saw him walk over to a chair, lean down, lift up the chair cushion and bring out a pistol. Barker was still standing at the threshold of the front door with Deputy Sheriff Valentine. Both men asked Rodriguez to put down the pistol. At about this time Barker saw Mrs. Rodriguez enter the living room. Rodriguez fired the pistol twice, and Barker and Valentine returned the fire with their shotguns. Rodriguez walked into the kitchen, then returned to the living room without the pistol. Valentine's tesimony was substantially the same as that of Barker's.

The testimony of Police Officer Rose corroborated that of Barker, Valentine and Dixon in regard to their having announced their presence as police officers. Rose also observed a light being turned on and off inside the apartment and heard the shuffling noises from within. He heard a federal narcotics agent announce in Spanish the presence of the police. Four other officers testified that they heard two pistol shots followed by the firing of two shotguns. A neighbor corroborated this sequence of the shots he had heard. Other neighbors testified that they had heard shouting and the word "police" followed by shooting.

In connection with the entry the District Court found that the presence of the police was announced in both English and Spanish by the officers, following which a light was turned on, then off, in the apartment and that there was some activity; that after the officers waited a short period of time in which to give the occupants an opportunity to open the door, the door was freed; that immediately after the officers' entry Rodriguez walked from the middle room into the living room, knelt on one knee, and removed a pistol from beneath the seat cushion of a chair; that Rodriguez fired the pistol twice in the direction of Deputy Sheriffs Barker and Valentine, after which these deputies each fired their shotguns once, Rodriguez being shot by one blast and his wife by the other.

We are unable to say that these findings are clearly erroneous. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746." United States v. Oregon State Medical Soc., 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952). *See also* Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776; American Commercial Lines, Inc. v. Eusay, 5 Cir., 1968, 395 F.2d 717, 718; Carlisle v. M/S Sistina, 5 Cir., 1969, 407 F.2d 824, 826. The record amply supports the findings of the Trial Judge that warnings of the presence of police were given prior to the entry by the officers of the Rodriguez premises and that Tomas Rodriguez was the first to open fire. Appellants' version of these incidents varies in many respects with the Court's findings and with the testimony of other witnesses. However, credibility choices and the resolution of conflicting testimony are within the province of the court sitting without a jury, subject only to the clearly erroneous rule of Fed.R.Civ. P. 52(a). Hodgson v. H. Morgan Daniel Seafoods, Inc., 5 Cir., 1970, 433 F.2d 918, 920.

Section 1983 of Title 42, U.S.C., provides a remedy in damages against every person acting under color of state law who deprives any citizen of any constitutional right. The statute provides a civil remedy and "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court reiterated the application of tort law standards to actions under this section. In *Pierson* damages for false arrest and imprisonment were sought against police officers who asserted defenses of good faith and probable cause in making an arrest under a statute which they believed to be valid. The Supreme Court, in considering the applicability of these common law defenses, said:

"Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved. Restatement, Second, Torts § 121 (1965); 1 Harper & James, The Law of Torts § 3.18, at 277–278 (1956); State of Missouri ex rel. and to Use of, Ward v. Fidelity & Deposit Co. of Maryland, 179 F.2d 327 (C.A. 8th Cir. 1950). A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." 386 U.S. at 555, 87 S.Ct. at 1218.

" * * * Part of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause.

"We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983. * * * If the jury believed the testimony of the officers and disbelieved that of the ministers, and if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional." 386 U.S. at 556–557, 87 S.Ct. at 1219.

This Court has followed *Monroe* and *Pierson, supra,* by applying common law tort principles in determining liability under Section 1983 cases. In Whirl v. Kern, 5 Cir., 1969, 407 F.2d 781, we said:

"As we read Pierson v. Ray, good faith and probable cause are defenses to an arrest not because of any language in § 1983, but because § 1983

must be read in a manner consistent with the background of tort liability." *Id.* at 788.

\* \* \* \* \* \*

" \* \* \* Pierson impressed the common law of torts into the service of the Civil Rights Act, and thereby made 'good faith' a defense to a suit under § 1983 only where it is also a defense 'under the prevailing view [of tort law] in this country.'" *Id.* at 791.

*See also* Anderson v. Nosser (en banc), 5 Cir., 1972, 456 F.2d 835, 841; Nesmith v. Alford, 5 Cir., 1963, 318 F.2d 110, 126.

In Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 1972, 456 F.2d 1339, the Second Circuit likewise applied common law principles to a Section 1983 case for damages against federal narcotics agents, alleging unlawful arrest and search, and stated in its opinion:

"At common law the police officer always had available to him the defense of good faith and probable cause, and this has been consistently read as meaning good faith and 'reasonable belief' in the validity of the arrest or search." *Id.* at 1347.

"Therefore, to prevail the police officer need not allege and prove probable cause in the constitutional sense. \* \* \* [W]e hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection." *Id.* at 1348.

In a concurring opinion in *Bivens*, Judge Lumbard noted:

"Ordinarily when a suit of this type is brought a court will already have de-

termined that there was no probable cause for the arrest and search complained of. Nevertheless the agent has a complete defense if he can convince the trier of the fact that he acted in good faith and that it was reasonable for him to have believed that the arrest and search were lawful. Thus there are two standards to be considered. The first is what constitutes reasonableness for purposes of defining probable cause under the fourth amendment for the protection of citizens against governmental overreaching. The other standard is the less stringent reasonable man standard of the tort action against government agents. This second and lesser standard is appropriate because, in many cases, federal officers cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves. It would be contrary to the public interest if federal officers were held to a probable cause standard as in many cases they would fail to act for fear of guessing wrong. Consequently the law ought to, and does, protect government agents if they act in good faith and with a reasonable belief in the validity of the arrest and search." *Id.* at 1348–1349.

■■■ The remedy under Section 1983 is, therefore, subject to defenses which are valid at common law. Consequently, in line with these well-established precedents we appraise the officers' conduct in forcibly entering the private dwelling of appellants against the background of tort liability to determine if damages are allowable under Section 1983. In so doing, we find that the test to be applied is the common law criterion of reasonableness of belief on the part of the officers.[3] "The privilege to make an arrest for a criminal offense carries with it the privilege to enter

---

3. The standards for judging the reliability of an informer's tip, recently enunciated by the Supreme Court in Aguilar v. State

of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584,

land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land *or if the actor reasonably believes him* to be there. (Emphasis supplied.) Restatement, Second, Torts § 204. To the same effect *see* 5 Am.Jur., Second, Arrest § 86, p. 774.

█ Force may be used to enter a dwelling and demand for admittance is not required if the actor reasonably believes the demand to be impractical or useless, and although the person sought is not in the dwelling the actor is privileged to use force if he reasonably believes him to be there and enters in the exercise of a privilege to make a criminal arrest under a valid warrant. Restatement, Second, Torts § 206. *See also* 5 Am.Jur., Second, Arrest §§ 87, 88, pp. 774–775; 6 C.J.S. Arrest § 14, p. 615; 87 C.J.S. Trespass § 55, p. 1007.

█ With these principles in mind, we have examined the circumstances upon which the officers relied in making their forcible entry to apprehend the fugitives, and conclude that the officers possessed the requisite reasonable belief. Three deputy sheriffs had been killed and their murderers had not been apprehended. The Sheriff's Office and the Police Department had been alerted. Arrest warrants had been issued for the suspects. Three days after the murders, a tip was received that the killers had been seen at the garage apartment.

Both Agent Voyles and Detective Rose testified that they considered the informant credible, that they had had occasion to act on information received from him in the past and it had been reliable. The informant told them that he had seen the suspects at the Rodriguez apartment the same evening. Both officers testified that the informant identified the premises by pointing to it three times as he was driven slowly past the location. Detective Rose further said that the informant told him that the suspects had said they were going to kill any officer who came after them. It was this information, later communicated to Captain Dixon and Sheriff Jones, that precipitated the plan to arrest the fugitives at the apartment. The plan failed, and a mistake was made. But the mistake was that of reasonable men, acting under circumstances which justified their belief that Guzman and Lopez were on the Rodriguez premises. Appellants are, therefore, not entitled to recover.

Appellants contend that the District Court erred in excusing the officers from the requirements of giving notice of authority and purpose prior to entry, as prescribed by Article 15.25 of the Texas Code of Criminal Procedure which states:

"In case of felony, the officer may break down the door of any house for the purpose of making an arrest, if he

21 L.Ed.2d 637 (1969) present no obstacle to this conclusion. Captain Dixon and Sheriff Jones, whose decision it was to act on the information given, and the District Judge who heard the case were aware not only of the "underlying circumstances" from which the informant concluded that Guzman and Lopez were present at the Rodriguez apartment [he had seen them there that evening], but also of the "underlying circumstances" from which the officers (Voyles and Rose) concluded that the informant was "credible" and his information "reliable" [they both had had occasions to successfully rely on tips furnished by the informant in the past]. *See Aguilar*, 378 U.S. at 114, 84 S.Ct. at 1514; *Spinelli*, 393 U.S. at 413, 89 S.Ct. at 587. *See also* McCray

v. State of Illinois, 386 U.S. 300, 304, 87 S.Ct. 1056, 1059, 18 L.Ed.2d 62 (1967); cf. Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). The District Judge found that the informer's report, upon which the officers' belief that Guzman and Lopez were present in the apartment, was predicated, provided probable cause for the entry, noting that the terms "probable cause" and "reasonableness" are virtually synonymous. *See, e. g.*, Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 2 Cir., 1972, 456 F.2d 1339 at 1348, citing numerous Supreme Court decisions to this effect. We agree that probable cause did exist, although reasonable cause was adequate under the circumstances.

be refused admittance after giving notice of his authority and purpose."

Interpretations of this statute by Texas courts afford us little guidance on this subject.[4] Section 3109 of Title 18, U.S.C.,[5] which is similar to the Texas statute, is a codification of the common law,[6] and the common law permits exceptions to the requirement of an announcement of authority. Compliance with the statute is not required if, *inter alia,* it would increase the officers' peril; Ker v. State of California, 374 U.S. 23, 40, 83 S.Ct. 1623, 1633, 10 L. Ed.2d 726 (1963); Restatement, Second, Torts § 206, Comment (d); Gilbert v. United States, 9 Cir., 1966, 366 F.2d 923, 931–932; Jackson v. United States, 1 Cir., 1965, 354 F.2d 980, 982; or if the conduct of a person is such to cause the officer to believe that he may be aware of the officer's presence and attempt to escape; United States v. Manning, 2 Cir., 1971, 448 F.2d 992, 1001–1002. The District Court found, and we agree, that these exceptions were applicable under the circumstances of this case.

Photographs of the Rodriguez apartment made after the shootings indicate that the personal effects of appellants had been rummaged through, drawers of furniture had been opened, their contents had been strewn about, and generally that a search had been made. Although the District Court concluded that the search was illegal, not having been made with the benefit of a search warrant or as an incident to a legal arrest, relief was nevertheless denied because of the failure of appellants to associate defendants with the search. We are likewise convinced that appellants failed to meet their burden of proof in this respect. Defendant Dixon testified that he looked around the apartment for Guzman and Lopez, but he did not participate in a search nor did he observe any of the deputy sheriffs making such a search. Defendant Barker said that he looked in a closet and in the restroom for Lopez but did not participate in any search of personal effects and did not see it taking place. Police Officer Rose said that he searched only for Guzman and Lopez, for whose arrest he had a warrant, that he did not pull out any of the personal effects of the occupants nor did he observe Barker and Valentine doing so. Defendant Valentine was not questioned about a search. Defendant Dyson learned about the shooting approximately eight hours after it occurred and was not questioned about a search. Mrs. Rodriguez testified that she saw a man searching the premises but was not questioned on the details of the search or the possible identity of the searcher. Defendant Jones was not asked whether he saw or participated in a search. None of the other witnesses present at the apartment was questioned regarding a search. The record does not substantiate the allegation that defendants either participated in or were responsible for the search.

Affirmed.

4. Kelley v. State, 1916, 80 Tex.Cr.R. 257, 190 S.W. 169, cited by appellees, is not directly in point.

5. 18 U.S.C. § 3109 reads as follows:
"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

Refusal by the occupants to admit the officer need not be verbal or affirmative. Failure of the occupants to respond to the officer's demand within a reasonable time is tantamount to refusal. A reasonable time is ordinarily very brief. *See* Restatement, Second, Torts § 206, Comment (d); Masiello v. United States, 1963, 115 U.S.App.D.C. 57, 317 F.2d 121; United States v. Chambers, 6 Cir., 1967, 382 F.2d 910.

6. Sabbath v. United States, 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759, 20 L.Ed. 2d 828 (1968).