Paul R. GETTLEMAN, Plaintiff,

v.

Stewart WERNER, Acting Commissioner of the Bureau of Corrections for the Commonwealth of Pennsylvania, et al., Defendants.

Civ. A. No. 73-567.

United States District Court,
W. D. Pennsylvania.
May 21, 1974.

Leonard I. Sharon, Michael L. Rosenfield, Pittsburgh, Pa., for plaintiff.

William C. O'Toole, Asst. Atty. Gen., Pittsburgh, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF COURT

MARSH, Chief Judge.

In this Civil Rights Act [1] case the plaintiff, Paul R. Gettleman, a former employee of the State Correctional Institute at Pittsburgh (Penitentiary), has sued the Acting Commissioner of the Bureau of Corrections, the Superintendent of the Penitentiary, a Deputy Superintendent, and three prison guards seeking compensatory and punitive damages for an allegedly illegal search and seizure to which he was subjected on June 27, 1973. Plaintiff's theory of liability, as revealed by his pretrial narrative statement, is that the three guards acting on orders from the Deputy Superintendent illegally subjected him to a strip-search and that the Superintendent and Commissioner knew or should have known of the guards' propensity to violate the plaintiff's Constitutional Rights under the First and Fourth Amendments. The defendants, on the other hand, contend that the search and seizure which occurred was justified by plaintiff's conduct which generated reasonable suspicion, and that the guards, with probable cause, relied in good faith upon standard procedures at the Penitentiary in stopping and searching employees for contraband, and Rule 9 of the "Handbook of Information and Rules for Officers and Employees of the State Correctional Institutions" (Handbook) (DX C and DX K), in seizing "questionable material." Also, the Acting Commissioner, Superintendent, and Deputy Superintendent contend that they are not liable for the actions of the guards because they neither actively participated in nor had any knowledge of the search and sei-

zure until after it occurred. The court finds a verdict in favor of the defendants.

The court makes the following:

## FINDINGS OF FACT

1. At all relevant times all parties to this action were employees of the Bureau of Corrections of the Commonwealth of Pennsylvania. The defendants were employed in the capacities stated in the caption and acted in those capacities under color of state law.

2. On January 26, 1972, the plaintiff, Paul R. Gettleman, was hired at the Penitentiary as a teacher; in the beginning he was assigned as librarian and subsequently taught in the prison school and was a notary for the Penitentiary. In 1973, he was admitted to the Bar and is now a practicing attorney in Allegheny County, Pennsylvania.

3. As part of his initial orientation as a Bureau of Corrections employee, plaintiff was supplied with the Handbook (DX C and DX K) and, on January 27, 1972, signed a waiver form in which he agreed to abide by said rules as a condition of his employment (DX B).

4. Smuggling contraband in and out of the prison is and has been a serious problem. Participants have been employees and guards as well as inmates. To remedy this situation, unannounced searches of employees and inmates are conducted to discover contraband coming into or going out of the prison. Contraband coming into the Penitentiary would be considered anything which was not issued to or available for purchase in the prison store by prisoners and was brought into the prison without the Superintendent's permission. Contraband leaving the institution would be anything which an employee was taking out for a prisoner without the consent of the

---

1. With his complaint for damages, injunctive and declaratory relief, plaintiff filed a motion for Temporary Restraining Order enjoining certain actions by defendants. After notice, a preliminary hearing was held and a preliminary injunction denied. Gettleman v. Werner, 361 F.Supp. 278 (W.D.Pa.1973). Subsequently, plaintiff withdrew his claim for injunctive relief. See Order of Court dated December 18, 1973. A jury trial on the liability issue was waived by all parties.

Superintendent.[2] The type of search varies from stop-and-frisk searches to body-intrusion searches.

5. Large signs are exhibited at the entrances and exits of the Penitentiary which state, "ALL VISITORS OR EMPLOYEES ARE SUBJECT TO SEARCH UPON ENTERING OR LEAVING THIS GATE." (DX A) At least two guards, picked at random, are searched daily, and other employees in the Penitentiary are frequently and routinely searched upon entering the Penitentiary and at times upon leaving it. Employees under suspicion or investigation by the guards for dealing in contraband may be searched during working hours. No set pattern or procedure has been established for determining which employees are to be searched during working hours, and individual guards of the rank of lieutenant or above use their discretion in initiating such searches.

6. Plaintiff first came under suspicion as a possible smuggler in May of 1972 when Lieutenant Kozakiewcz, a named defendant, discovered two letters in a prisoner's jacket referring to "Mr. Gettleman" and "Paul." A fair reading of these letters indicates that the plaintiff was acting as a go-between for a prisoner at the Penitentiary and another prisoner at the Allegheny County Jail and that he was attempting to find a way to transfer money from certain prisoners at the Penitentiary to the prisoner at the County Jail. Money is considered to be contraband at the Penitentiary. See Footnote 2.

Lieutenant Kozakiewcz turned these letters over to Superintendent Walters.

Subsequently, Major Jasak and Captain Krall, both defendants herein, noticed the plaintiff in the prison yard with large groups of inmates gathered around him, which is prohibited by Rule 6 and reportable by Rule 14 in the Handbook.[3] On occasion it was necessary to send prison guards into the yard to break up these crowds. Major Jasak submitted several reports to the Superintendent critical of plaintiff's conduct in this respect.

7. In the one and one-half year period from January 26, 1972, to June 27, 1973, plaintiff had been searched 35 or 40 times, usually when he was entering or leaving the Penitentiary with books. He made no objection.

8. On June 14, 1973, Officer Bodner of the security staff reported to Captain Krall that at approximately 8:50 A. M., while he was standing guard at the Number Seven Tower, he had observed plaintiff give one of the residents two cubes of white substance in the vicinity of the storeroom and bocci court. See Footnote 2.

9. Captain Krall asked the plaintiff if he had given anything to a resident that day. The plaintiff responded that he had given a resident two pieces of garlic that he had brought in from the outside. Plaintiff said he did not know the name of the resident involved. Captain Krall informed plaintiff that anything he brought in from the outside without prior authorization was considered contraband, and the plaintiff denied knowledge of any such rule. Captain Krall made a formal written report of this incident to Major Jasak and Deputy Superintendent Jennings. (DX I).

10. The next day, June 15, 1973, plaintiff prepared a list of handwritten demands he planned to submit to a guard attempting to search him (PX A, see Finding 13).

Later that day, plaintiff was stopped and frisked twice—once by Lieutenant Kozakiewcz and once by Lieutenant Kozakiewcz and Captain Krall and another

---

2. Rule 10 of the Handbook (DX C and DX K) provides: "No unauthorized message, written or oral, nor any unauthorized article, should be conveyed to, or received from an inmate."

3. Rule 6 provides: "There shall be no undue familiarity between personnel and inmates." Rule 14 provides: "All officers and employees are expected to be alert at all times, and to observe and report to proper authority any unusual situations, gatherings, and conversations or events."

guard. During both searches, plaintiff was asked to remove his shoes and socks and he complied. He did not show his prepared lists of demands (PX A) to the searching guards on either occasion.

11. On or about June 18, 1973, Deputy Superintendent Jennings, a named defendant, conducted a meeting which was attended by the defendant guards. Deputy Jennings informed the guards of a directive he had received from the Director of Operations, Ronald J. Marks, stressing the need for "systematic thorough search procedures" covering all residents and personnel (DX J). The directive stated that "known troublemakers" were to receive special attention.

Deputy Jennings informed the guards at this meeting that they were becoming lax in searching residents and employees for contraband. Plaintiff was particularly discussed and Jennings informed the guards that he was concerned and disturbed by several reports he had received concerning plaintiff's activities. The guards in general and Lieutenant Kozakiewcz in particular were instructed to keep plaintiff under surveillance as he was under investigation and suspected of conveying contraband. The security personnel were authorized to conduct any searches they felt were necessary and to use their good judgment in determining the extent of the search as the situation indicated.

12. On June 27, 1973, at approximately 3:40 P.M., plaintiff approached the rear gate to the rotunda of the administrative building. One may pass through the rotunda in making an exit to the outside of the Penitentiary. Lieutenant Kozakiewcz was on duty and in charge of security in the rotunda. Plaintiff called Lieutenant Kozakiewcz to the rear gate and handed him a carbon copy of a letter he had written to Superintendent Walters which was critical of Kozakiewcz. Kozakiewcz did not read the letter at this time. Another guard admitted the plaintiff into the rotunda. At this point the plaintiff, who was in possession of letters, was about 50 feet from the exit leading out of the Penitentiary. In the rotunda, Lieutenant Kozakiewcz requested the plaintiff to submit to a search. Plaintiff stated he had prisoner mail which had to be delivered to the mailroom on the third floor by four o'clock. Kozakiewcz insisted on an immediate search. Plaintiff refused and became loud, angry and belligerent. Other employees and visitors were in the rotunda at this time of the day. Plaintiff refused to be searched unless Deputy Superintendent Zimmerman was present and unless Lieutenant Kozakiewcz complied with his handwritten list of demands (PX A) which he gave to the Lieutenant.

13. This list of demands is unprecedented insofar as search procedures at the Penitentiary are concerned. The demands (PX A) provided:

"1. I want a person from the treatment staff present.

2. I want the name, in writing, of the person who ordered the search.

3. I want to know, in writing, the reason for this search.

(a) What, if any is the factual basis behind this search or is this simply a form of harassment.

4. I want the list of all other personnel searched during the proceeding (sic) month, on what dates, for what reasons and what, if anything, was found.

5. If he finds it necessary to go through my wallet and personal papers, it will be necessary for you to get a search warrant from the proper issuing authority."

(The fifth demand, of course, would immediately cause the guards to suspect the contents of plaintiff's wallet.)

14. Upon plaintiff's refusal to submit to a search, Lieutenant Kozakiewcz summoned his immediate superior, Captain Krall, who observed that plaintiff was speaking in a loud voice and that visitors and employees were watching the confrontation. Captain Krall asked plaintiff to step into a nearby staff conference room and plaintiff complied.

15. Plaintiff again refused to submit to a search and handed the list of demands to Captain Krall. Captain Krall summoned his superior, Major Jasak, to the conference room. Major Jasak was in charge of all security.

16. When Major Jasak arrived, plaintiff gave him his list of demands and again requested the presence of Deputy Zimmerman and stated he refused to be searched until Zimmerman was present and his written demands were complied with.

17. Because of the plaintiff's attitude and insistent refusals, all three guards became suspicious that he was carrying contraband on his person or in his wallet, and since they had recently been instructed to keep plaintiff under surveillance, they decided that he should be strip-searched.

18. Lieutenant Kozakiewcz ordered the plaintiff to take off his clothes and plaintiff complied.

Lieutenant Kozakiewcz inspected plaintiff's clothing and also leafed through the books and material he was carrying and his notary log. Captain Krall searched the plaintiff's wallet. Major Jasak observed these proceedings.

19. None of the guards touched the plaintiff, threatened him with physical force, or physically restrained him.

20. No contraband was found. Two documents were found in plaintiff's wallet. One was an unsigned rough draft of a letter written in pencil by the plaintiff to the Attorney General of Pennsylvania. (PX B)[4] The draft letter was highly critical of the manner in which Major Jasak conducted disciplinary proceedings at the Penitentiary. The other paper was a sarcastic motion written by a prisoner addressed to the Common Pleas Court of Allegheny County (PX 5).[5] Upon finding these documents Captain Krall handed them to Major Jasak who read them.

21. After the strip-search, the plaintiff was permitted to dress and leave after being told that his papers (PX A, PX B, and PX 5) would be delivered to Deputy Superintendent Zimmerman.

The plaintiff protested, arguing that the draft letter was not contraband and the guards had no reason to seize it.

Notwithstanding, Major Jasak retained the documents. Pursuant to the rules and regulations of the institution he reasonably believed that they were "questionable material," and in the absence of the Superintendent, he turned PX A, PX B, and PX 5 over to Deputy Superintendent Zimmerman. These documents were returned to the plaintiff the next day.

Rule 9 of the Handbook (DX C and DX K) provides: "All correspondence and telephone calls relative to institutional affairs or inmates must be authorized or cleared through the office of the Superintendent or Warden." See also, General Principles, (B) 1.[6]

22. Plaintiff typed a letter to Attorney General Israel Packel (PX 8), which letter substantially followed the penciled draft (PX B). The typed letter was dated June 28, 1973.[7]

---

4. PX B was identified as PX 4 at the Temporary Restraining Order Hearing held on July 11, 1973.

5. This paper was identified as PX 5 at the Temporary Restraining Order Hearing held on July 11, 1973.

6. General Principle (B) 1. is as follows: "It is unethical on the part of any employee to criticize the policies of the Institution, except in a constructive way with his suggestions reduced to writing and presented to the proper officials. Every employee may feel assured that his recommendations, properly made, will be heartily welcome at any time."

7. At the hearing on the Temporary Restraining Order held July 11, 1973, plaintiff testified that on the day of the search he told Deputy Superintendent Zimmerman to give the seized documents to Superintendent Walters. On June 28, 1973, plaintiff promptly typed the letter to the Attorney General (PX 8) and another letter (PX 9) and mailed them with enclosures (PX 1, 2, and 3), sending copies to Commissioner Sielaff, Superintendent Walters, and Major Jasak. Since the typed letters addressed to Attorney General Israel Packel (PX 8 and PX 9) were dated June 28, 1973, we find that Superintendent Walters returned the seized letter (PX B) to the plaintiff on that date.

23. Acting Commissioner Stewart Werner, Superintendent Walters, and Deputy Superintendent Jennings were at the Central Office in Camp Hill on June 27, 1973, and were not informed of the strip-search until after it had occurred.

24. The defendant guards, as well as the plaintiff, had been supplied with copies of the Handbook upon entering employment with the Bureau of Corrections and each agreed to abide by the rules and regulations contained therein.

25. There is no competent evidence that prior to June 15, 1973, the searches to which the plaintiff was subjected were more frequent, broader in scope, or other than the usual searches of Penitentiary employees. While there was longstanding suspicion and distrust of the plaintiff by the defendant guards at the Penitentiary, which was reciprocated by the plaintiff, this did not manifest itself in any abuse or misuse of authority directed against the plaintiff by any of the defendants.

26. The search procedure on June 27, 1973, to which plaintiff was subjected, had its origin and motivation in the instructions received at the June 18, 1973 meeting to increase security and to keep plaintiff under surveillance. This search was not willful, wanton and malicious on the part of the guards. Plaintiff's recent admission of giving contraband, i. e. garlic, to an inmate and his attitude in refusing to be searched were factors causing the guards to become suspicious, and determine that a strip-search was indicated and necessary. These were objective facts that would reasonably cause experienced prison guards to suspect that plaintiff was probably concealing something in his clothes, wallet or on his body for the purpose of transporting it out of the prison, contrary to established regulations. The guards confiscated documents in plaintiff's wallet because of a reasonable good faith belief that they were obliged to do so by Rule 9.

[1] 27. The strip-search was an isolated incident and was not ordered nor subsequently ratified or acquiesced in by the Acting Commissioner, the Superintendent, or the Deputy Superintendent. In such circumstances these defendants would not be liable even if the guards were. Johnson v. Glick, 481 F.2d 1028, 1033–1034 (2nd Cir. 1973); Cf. Johnson v. Alldredge, 488 F.2d 820 (3rd Cir. 1973).

## DISCUSSION

A Penitentiary is a unique institution fraught with sensitive security hazards, not the least of these being smuggling of contraband such as drugs, money, knives, etc.[8] The state has a high security interest in eliminating smuggling into and out of penitentiaries. In this respect, prison guards must have discretion to act quickly and decisively, and other reasonable procedures in everyday disciplinary problems should not be employed to handcuff prison guards in following the orders and directives designed to eliminate smuggling.

▮▮▮▮ Constitutional Rights of an employee in a penitentiary may be diluted by the specialized requirements of discipline, safety and security, and a federal court "[should] be reluctant to intervene in matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to state officials." Cf. Gray v. Creamer, 465 F.2d 179, 183–184 (3rd Cir. 1972); Gittlemacker v. Prasse, 428 F.2d 1, 4 (3rd Cir. 1970); Negrich v. Hohn, 379 F.2d 213, 215 (3rd Cir. 1967). A prison employee, upon entering the prison gate, leaves his Fourth Amendment rights on the outside to the extent that a search warrant, or probable cause, is required to validate a search for contraband. Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); Stroud v. United States, 251 U.S. 15, 21, 40 S.Ct. 50, 64 L.Ed. 103 (1919); Daughtery v. Harris,

8. *Cf.* Daughtery v. Harris, 476 F.2d 292, Footnote 1, (10th Cir. 1973); Lanza v. New York, 370 U.S. 139, 143, Footnote 14, 82 S. Ct. 1218, 8 L.Ed.2d 384 (1962); 18 U.S.C. § 1791; 28 C.F.R. § 6.1.

476 F.2d 292 (10th Cir. 1973). Of course, a prison employee retains a right to be free from oppressive or unreasonable searches which shock the conscience of the court, but in the totality of the circumstances involved in the case *sub judice,* the search of the plaintiff does not appear to be shocking or unreasonable. *Cf.* Blackford v. United States, 247 F.2d 745 (9th Cir. 1957) ; Daughtery v. Harris, *supra.*

◼ Plaintiff's recent transfer of contraband to an inmate whose name he denied knowing and his unprecedented demands and refusal to submit to a search constituted a justifiable basis for the defendant guards to suspect and believe that plaintiff was hiding contraband on his person and that a strip-search was appropriate. Such a decision was within their discretion.

◼ The inherent characteristics of a prison society, including guards, teachers, visitors and officials, are such that guards must make prompt decisions as search problems confront them. The governmental interest in preventing and detecting smuggling outweighs the individual interest in perfect justice. Alleged intentional, willful and harassing action [9] pursued by the prison guards is an inevitable incident of effective management and control of contraband smuggling. Since the defendant guards followed their orders (DX J) and acted in good faith with reasonable suspicion and belief in ordering a strip-search of plaintiff on June 27, 1973, they are not liable in damages. Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ; Hill v. Rowland, 474 F.2d 1374, 1377–1379 (4th Cir. 1973) ; Rodriguez v. Jones, 473 F.2d 599 (5th Cir. 1973) ; *Cf.* Bevens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 456 F.2d 1339, 1347 (2nd Cir. 1972).

◼ It would be unjust in the absence of bad faith to subject the prison guards to monetary liability, when required by the obligation of their positions to exercise discretion. Prison guards who fail to make decisions when they are needed or do not act to implement decisions when they are made do not fully and faithfully perform the duties of their office. In suspicious circumstances, as here, prison guards should not have to fear being mulcted in damages if they order a strip-search, more than being charged with dereliction of duty if they do not. *Cf.* Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, 42 L.W. 4543 (1974).

Even if Rule 9 (quoted *supra*), as interpreted by the defendant guards, would be held to be unconstitutional in a prison setting, which we doubt, in seizing the censorious handwritten draft of a letter to the Attorney General (PX 4) and the sarcastic motion (PX 5) and delivering them to Deputy Superintendent Zimmerman, the guards acted in a good faith reasonable belief that these communications were proscribed by Rule 9 and it was their duty to seize them and transfer them to the Superintendent. Pierson v. Ray, *supra;* Hill v. Rowland, *supra;* Rodriguez v. Jones, *supra.*

◼ The abbreviated possession of the documents seized, coupled with their prompt return by the Superintendent, is persuasive that plaintiff did not sustain any grievous loss. It is to be observed that plaintiff sent a typed copy of the seized draft letter not only to the Attorney General under date of June 28, 1973, but also sent a copy to some of the defendants who he claims violated his First Amendment right of privacy by participating in its seizure. In these circumstances, even if we should hold that the guards acted unlawfully in seizing the "questionable material" in plaintiff's wallet, the plaintiff would be entitled only to nominal damages. Magnett v. Pelletier, 488 F.2d 33 (1st Cir. 1973).

### CONCLUSIONS OF LAW

1. The court has jurisdiction pursuant to Title 42 U.S.C. §§ 1983, 1985, and

---

9. See plaintiff's pretrial statement, Item I, 8, page 2, and Item IV, Points of Law, 1, page 3.

its jurisdictional counterpart, 28 U.S.C. § 1343(3) and (4).

2. The plaintiff failed to prove by a fair preponderance of the evidence that the defendants, Acting Commissioner Werner, Superintendent Walters, and Deputy Superintendent Jennings, violated his civil rights under the First and Fourth Amendments.

3. The defendant prison guards, Lieutenant Kozakiewcz, Captain Krall, and Major Jasak, having acted upon reasonable suspicion and probable cause in ordering the plaintiff inside the Penitentiary to remove his clothes and searching them, his wallet, and his books and papers, did not violate plaintiff's civil rights under the Fourth Amendment.

4. The defendant prison guards, aforesaid, having acted in good faith in the enforcement of Rule 9 of the Handbook, which plaintiff agreed to abide by, did not violate plaintiff's civil rights under the First Amendment.

5. Judgment should be entered in favor of the defendants, Acting Commissioner Stewart Werner, Superintendent Gilbert Walters, Deputy Superintendent William Jennings, Major John Jasak, Captain Edward Krall, and Lieutenant Charles Kozakiewcz.