Erwine **LAVERNE** and Estelle Laverne,
Plaintiffs,

v.

Howard J. **CORNING,** Jr., et al.,
Defendants.

No. 67 Civ. 2830.

United States District Court,
S. D. New York,
Civil Division.

May 21, 1974.

Cohn, Glickstein, Lurie, Ostrin & Lubell by Jonathan W. Lubell, New York City, of counsel, for plaintiffs.

Mudge, Rose, Guthrie & Alexander by Henry Root Stern, Jr., Thomas R. Esposito, P. Jay Wilker, New York City, of counsel, for defendants

OPINION

WHITMAN KNAPP, District Judge.

The events underlying this civil rights case had their origin twenty years ago. Since then something like a dozen judicial decisions have been entered on various aspects of the case. Village of Laurel Hollow v. Laverne Originals, Inc. (2d Dept. 1954) 283 A.D. 795, 128 N.Y.S. 2d 326, aff'd, 307 N.Y. 784, 121 N.E. 2d 618; People v. Laverne (1964) 14 N.Y.2d 304, 251 N.Y.S.2d 452, 200 N.E. 2d 441; Village of Laurel Hollow v. Laverne, Inc. (Nassau County 1964) 43 Misc.2d 248, 250 N.Y.S.2d 951; (2d Dept. 1965) 24 A.D.2d 615, 262 N.Y.S. 2d 622; Village of Laurel Hollow v. Laverne Originals, Inc. (2d Dept. 1965) 24 A.D.2d 616, 262 N.Y.S.2d 625, aff'd, 17 N.Y.2d 900, 271 N.Y.S.2d 996, 218 N.E.2d 703; Laverne v. Corning et al. (2d Dept. 1965) 24 A.D.2d 602, 262 N. Y.S.2d 711, appeal dismissed, 16 N.Y.2d 866, 264 N.Y.S.2d 103, 211 N.E.2d 523; Laverne v. Inc. Village of Laurel Hollow (2d Dept. 1965) 24 A.D.2d 842, 263 N. Y.S.2d 695; Laverne v. Inc. Village of Laurel Hollow et al. (2d Dept. 1964) 22 A.D.2d 826, 255 N.Y.S.2d 146, 25 A.D.2d 564, 267 N.Y.S.2d 756, aff'd, 18 N.Y.2d 635, 272 N.Y.S.2d 780, appeal dismissed, 386 U.S. 682, 87 S.Ct. 1324, 18 L.Ed.2d 403; Laverne v. Corning (S.D.N.Y. 1970) 316 F.Supp. 629; Laverne v. Corning (S.D.N.Y.1972) 354 F.Supp. 1402. It is therefore my fond hope now to finally (naturally with the exception of an appeal) dispose of the matter.

The procedural history of the case can be briefly related:

In 1954 the Village of Laurel Hollow brought an action against Erwine and Estelle Laverne (or, more accurately, against their wholly-owned corporation) to enjoin the Lavernes from using property located in the Village in violation of a zoning ordinance that forbade commercial use. The Village alleged that wallpaper was being manufactured on the Laverne property. The Lavernes apparently did not dispute the allegation, but instead bottomed their defense on the doctrine of prior nonconforming use. This defense failed, and the resulting injunction was affirmed as modified by the Appellate Division, Laurel Hollow v. Laverne Originals, Inc. (2d Dept. 1954),

283 A.D. 795, 128 N.Y.S.2d 326, and by the Court of Appeals (1954), 307 N.Y. 784, 121 N.E.2d 618.

Years passed, during which time some correspondence was exchanged between the Village and the Lavernes indicating that the Lavernes' use of their property remained a sore point.

On July 24, 1962 the Building Inspector of the Village, Hugh Johnson, was driving by the Laverne property and noticed that the gate—normally locked—was open. His curiosity having recently been aroused by a neighbor's offhand comment to the effect that trucks were parading in and out of the Laverne driveway, Mr. Johnson drove in. A Laverne employee, unaware of Mr. Johnson's official status, showed him around. In the course of the tour Mr. Johnson discovered what to him appeared to be evidence that the Lavernes were violating the 1954 injunction—viz., vats, drying tables, etc.

Mr. Johnson reported what he had seen to the Village Trustees, and they voted to conduct a second inspection, which took place on October 18, 1962. Photographs taken by the Village officials were accidentally overexposed, and thus a third and final inspection occurred on December 17, 1962 for the purpose of taking additional photographs.

The Lavernes were not asked to consent to these inspections, the purported authority for them being derived from a Village Ordinance which provided:

"It shall be the duty of the Building Inspector, and he hereby is given authority, to enforce the provisions of this ordinance. The Building Inspector in the discharge of his duties shall have authority to enter any building or premises at any reasonable hour. (Art. X, § 10.1)"

There are conflicting versions of exactly what happened next (about which more will be said later) but it is undisputed that three separate criminal informations, two contempt proceedings and a penalty proceeding were brought against the Lavernes on the basis of the evidence obtained from the inspections. Judgments against the Lavernes resulted in every proceeding.

On June 10, 1964 the New York Court of Appeals, in a landmark decision, reversed Mr. Laverne's conviction on the three criminal informations on the ground that the Village ordinance which purported to authorize the three inspections was unconstitutional, and that therefore the fruits of those inspections could not lawfully be used against the defendant (14 N.Y.2d 304, 251 N.Y.S. 2d 452, 200 N.E.2d 441).

Following that decision, the other judgments against the Lavernes were reversed.[1]

The instant suit was commenced in 1967 by the Lavernes against the various Village officials who had played some part in the three inspections. The complaint alleged that under 42 U.S.C. §§ 1983–88 plaintiffs were entitled to damages—basically the legal fees expended in connection with the above-described litigations—for the violation of their Fourth Amendment rights.

In 1970 both sides moved for summary judgment solely on the question of liability, and Judge Tenney granted judgment to the plaintiffs (316 F.Supp. 629). Judge Tenney's opinion held that the New York Court of Appeals' decision in People v. Laverne, supra, 14 N.Y.2d 304, 251 N.Y.S.2d 452, 200 N.E.2d 441 precluded any finding other than that the Lavernes' Fourth Amendment rights had been violated. Judge Tenney also held that the question of fact as to whether the Village officials had acted in good faith would not have to be resolved by a trial because good faith was not a defense to plaintiffs' action.

The following year, the Second Circuit Court of Appeals decided Bivens v. Six Unknown Federal Narcotics Agents (1972), 456 F.2d 1339, on remand from

1. During the same period the Lavernes had commenced three civil actions against the Village. All three were dismissed for a variety of reasons, see cases cited *supra*.

the Supreme Court (1971), 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619. The Second Circuit held that federal narcotics agents are not immune from liability for violation of the Fourth Amendment rights of other persons, but that they may assert their good faith as a defense to actions brought by such persons.

On the basis of *Bivens*, the instant defendants moved to vacate Judge Tenney's order granting partial summary judgment to plaintiffs. Judge Tenney denied the motion (354 F.Supp. 1402). Judge Tenney expressed the view that *Bivens* was inapplicable to the case at bar, but ruled that as a matter of procedure it would be wiser to leave the question to the trial judge. Judge Tenney suggested that the question of good faith be tried and a special verdict employed.

In March of this year, the court adopted Judge Tenney's suggestion and the case went to trial solely on the question of defendants' good faith. As it turns out, the suggestion was a very valuable one; for the development of the record at trial manifestly has afforded the court a much fuller and more accurate picture of the pertinent events than the one earlier presented to Judge Tenney.

All defendants testified without material contradiction that—in substance— the discovery of the apparent violation of the 1954 injunction was the result of Mr. Johnson's poking around the property with the misinformed consent of the Lavernes' employee; and that once the violation was discovered, defendants believed they were authorized and indeed obliged to confirm its existence and have it corrected. The testimony also established beyond doubt that defendants' inspections had never intruded on any residential portions of the Laverne property but had been restricted to areas where plaintiffs' corporation was believed to be carrying on its business activities. In addition, defendants called as an expert Professor Norman Dorsen of the N.Y.U. Law School, who essentially testified that in 1962 only a clairvoyant could have realized that the defendants' inspections would some day be declared to have violated the Fourth Amendment prohibition against unreasonable searches and seizures.

Neither Mr. nor Mrs. Laverne was able to testify to a single fact that might have tended to rebut the defendants' claimed good faith. The Lavernes' testimony centered upon the question of whether their own activities on the property had in fact constituted a continuing violation of the injunction or— as plaintiffs hotly contended—had merely been their private activities as professional artists. It was plaintiffs' contention that the equipment seen by defendants was so plainly that which one would expect to find in any artist's studio, that defendants' inference of violation drawn from that equipment was a fortiori evidence of defendants' bad faith. We cannot, of course, know whether the jury rejected the factual underpinnings of this argument or merely declined to draw the inferences urged by plaintiffs.

In any event the jury found specially that each defendant had acted in good faith, as that phrase was defined in the court's charge.

At the conclusion of the trial, the court invited defendants to make a motion for summary judgment on the ground that to the extent that plaintiffs' damages were expenses incurred in connection with the legal proceedings brought against them, such damages had not been "caused" in the legal sense by defendants' acts but rather by plaintiffs' insistence upon continuing to violate the village zoning ordinance and injunction. However, in view of the disposition being made of the main issue, the resolution of that question becomes academic. If good faith be a complete defense, no other question need be considered. For the reasons that follow, we hold that the good faith in which defendants were found to have acted is a complete defense to the action.

We begin with *Bivens*. There, as Mr. Justice Brennan describes it in his opinion remanding the matter to the Second Circuit, federal narcotics agents entered

Bivens' apartment early one morning without a warrant, manacled and arrested him, searched the entire apartment and then took him to the federal courthouse where he was questioned, booked, and strip-searched. Bivens subsequently brought suit in federal court seeking $15,000 from each agent under the Fourth Amendment for the emotional damage he had suffered as a result of his warrantless arrest without probable cause. The district court had originally held that 1) the plaintiff had no federal cause of action under the Fourth Amendment and that 2) even if there were such a cause of action, the federal agents were immune from suit [276 F. Supp. 12 (E.D.N.Y.1967)]. The Court of Appeals affirmed on the first ground and thus did not reach the second (409 F.2d 718). The Supreme Court reversed, holding that the plaintiff did have a cause of action under the Fourth Amendment and remanded the case for a ruling on the immunity question (403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619).

On remand, the Court of Appeals held that the agents did not have immunity, but that they could assert the defense of good faith. The court stated (456 F.2d at 1348):

"It is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection."

In so holding, the court noted that the defense of good faith is available in analogous § 1983 cases brought against state and local police officers, and that it was equally available in false arrest cases at common law. The court also observed that the law of "probable cause" was so complex and chameleon-like that it would be grossly unfair to

require police officers to act at their peril while trying to find their way in that "thicket."

The question before us is whether there is any sound reason to hold the reasoning of *Bivens* inapplicable to the case at bar. We think not.

All parties are in agreement that *Bivens* and the other pertinent authorities stand for the proposition that good faith should be permitted as a defense to a civil rights action if that defense could have been asserted in the most analogous tort action at common law. The sole disagreement is whether good faith could have been asserted in the closest analogue at common law to the instant action—namely, an action in trespass. Plaintiffs contend that it could not have been.

To support that contention, plaintiffs cite O'Horo v. Kelsey (4th Dept. 1901) 60 A.D. 604, 70 N.Y.S. 14, and Socony-Vacuum Oil Co. v. Bailey (Sup.Ct. Cattaraugus Co. 1952) 202 Misc. 364, 109 N.Y.S.2d 799. Neither of those cases involved trespass by a public official, and in our view they would not necessarily control in such a situation. Indeed it would appear that an action in trespass did not lie against a public official at all at common law because such officials were then cloaked with at least a qualified privilege. See, e. g. Edwards v. Law (2d Dept. 1901) 63 A.D. 451, 71· N.Y.S. 1097; Remington v. State (3d Dept. 1906) 116 A.D. 522, 101 N.Y.S. 952,[2] Harper and James (1956) Vol. I The Law of Torts § 1.20. It was not until Laverne v. Corning was decided in 1962 that this privilege of public officers was challenged on constitutional grounds.

We are satisfied that the common law would have afforded these defendants the opportunity to establish that they inspected plaintiffs' property because they reasonably believed in good faith that such inspections were lawfully au-

2. Plaintiffs cite *Remington* for the proposition that good faith was no defense at common law. The decision specifically states

however that entry "under legislative authority" would not constitute trespass at all. 101 N.Y.S. 952, 954.

thorized by Article X, § 10.1 of the Village Ordinance (*supra* p. 4).

It then behooves us to consider whether there is anything contained in *Bivens* or in any other pertinent decision that would lead us to believe that good faith should not be a defense here. We read those decisions to require that the defense be permitted.

As already noted, the Court of Appeals in *Bivens* specifically recognized the unfairness of any rule that would force a police officer to predict at his peril future developments in search and seizure law.

The same point is stressed by the Supreme Court in Pierson v. Ray (1967) 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. There the court squarely faced the question of whether good faith was a defense to a § 1983 claim brought by ministers who had been arrested while attempting to use segregated facilities in Jackson, Mississippi for violation of a "breach of the peace" statute subsequently held unconstitutional. Plaintiffs had sued under the common law of Mississippi for false arrest as well as under the federal civil rights law. The court held that good faith was a defense to the § 1983 claim (at 557):

> "The defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983."

In reaching that conclusion, the court observed (at 555):

> "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, *the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as*

*applied.*" (fn. omitted, emphasis supplied.)

The holding of *Pierson* and its rationale were recently reaffirmed in Scheuer v. Rhodes (1974) 42 U.S.L.W. 4543,— U.S. ——, 94 S.Ct. 1683, 40 L.Ed.2d 90. Mr. Chief Justice Burger, for a unanimous court, rejected the notion that state executive officers possess an absolute immunity from § 1983 liability. Instead the court suggested that a limited immunity is available to such officers (42 U.S.L.W. at 4548 [94 S.Ct. at 1692]):

> "These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. *It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances coupled with good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct.* Mr. Justice Holmes spoke of this, stating:
>
> > 'No doubt there are cases where the expert on the spot may be called upon to justify his conduct later in court, notwithstanding the fact he had sole command at the time and acted to the best of his knowledge. That is the position of the captain of a ship. But even in that case great weight is given to his determination and the matter is to be judged on the facts as they appeared then and not merely in the light of the event.' (citations omitted.) Moyer v. Peabody, 212 U.S. 78, 85 [ 29 S.Ct. 235, 237, 53 L.Ed. 410] (1909)." (emphasis supplied)

In articulating the considerations relevant to a determination of the scope of an executive officer's immunity, the court relied upon the language we have

quoted from Pierson v. Ray to the effect that a police officer should not at his peril be required to predict the future course of constitutional law.

Further support for permitting the good faith defense is found in Tucker v. Maher (2d Cir. 1974) 497 F.2d 1309.

There the court held that good faith may be asserted as a defense by a deputy sheriff in an action based on an unconstitutional attachment (at 1313):

"The only basis for Tucker's claim against [the deputy sheriff] is that the statute under which he proceeded was unconstitutional. It is well settled, however, that a peace officer cannot be charged with the responsibility of predicting the future course of constitutional law. Pierson v. Ray * * *. In the absence of bad faith, it is therefore apparent that no action lies against [the sheriff] under § 1983. There is abundant authority for this proposition *even* where a warrantless arrest is made." (emphasis supplied, citations omitted.)

We emphasize the word "even" to illustrate that a warrantless arrest is obviously considered a more serious intrusion than an illegal attachment of property or an illegal trespass of the nature here involved.

In short, we do not read the cases to mean that a police officer who deprives a person of his liberty by arresting him or her can if later sued under § 1983 avail himself of the defense that he had a good faith, reasonable belief in the lawfulness of the arrest, but that a fellow officer who simply trespasses upon a person's property cannot be heard to claim that he acted with the good faith belief that his entry was lawfully authorized by statute or ordinance.

Considering this case as we must against the background of the common law, we hold that the jury's finding of good faith protects defendants from liability for

"acting under a statute that [they] reasonably believed to be valid but

that was later held unconstitutional". Pierson v. Ray, 386 U.S. at 555.

In view of this disposition of the first question posed, the answers to the others become academic—and will remain so unless the Court of Appeals disagrees with the foregoing.

The plaintiffs' complaint is dismissed. So ordered.