**Erwine LAVERNE and Estelle Laverne, Plaintiffs-Appellants,**

v.

**Howard J. CORNING, Jr., Mayor, et al., Defendants-Appellees.**

No. 419, Docket 74–1856.

United States Court of Appeals, Second Circuit.

Argued April 30, 1975.

Decided July 3, 1975.

Michael Ratner, New York City (Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City, on the brief), for appellants.

Henry Root Stern, Jr., New York City (Thomas R. Esposito, P. Jay Wilker, Mudge, Rose, Guthrie & Alexander, New York City, on the brief), for appellees.

Before MOORE and MANSFIELD, Circuit Judges, and HOLDEN,* District Judge.

MOORE, Circuit Judge:

The principal issue presented by this appeal is whether the defendants—the Mayor, Deputy Mayor, Building Inspector and other officials of the Village of Laurel Hollow, Nassau County, Long Island—are entitled to assert good faith as a defense in this civil rights suit brought under 42 U.S.C. §§ 1981–88 seeking dam-

ages for violations of the plaintiffs' Fourth Amendment rights. A brief outline of the facts and the procedural history of this litigation is required.

The plaintiffs Erwine and Estelle Laverne are artists and designers. In 1949 they purchased the Tiffany Estate, located in the Village of Laurel Hollow. The area in which the premises are located was zoned exclusively for residential purposes and could not lawfully be used for commercial endeavors. In 1950 the Village brought an action in state court to enjoin the Lavernes from using the premises as a factory. The trial court granted the injunction, and the New York appellate courts modified it and kept it in effect.[1]

Sometime prior to July 1962, Hugh G. Johnson, the Village Building Inspector, received an informal complaint from a neighbor of the Lavernes indicating that numerous trucks were entering and leaving the premises. A section of the Village zoning ordinance gave the Building Inspector authority to enforce its provisions and for that purpose empowered him "to enter any building or premises at any reasonable hour."[2] Another section of the zoning ordinance subjected violators to criminal disorderly conduct charges and fines of $100 a day while a violation existed.[3]

Pursuant to his authority under the ordinance, Johnson on several occasions sought to inspect the Laverne premises, but in each instance he found the front gate locked and could arose no one by knocking. On July 24, 1962, while driving past the property with an architect friend, Johnson noticed that the front gate was open, permitting access into the courtyard. Johnson stopped and, accompanied by his friend, entered the gate. He came upon three Laverne employees engaged in unclogging a drain.

---

* Chief Judge, United States District Court for the District of Vermont, sitting by designation.

1. *Incorporated Village of Laurel Hollow v. Laverne Originals, Inc.,* 283 App.Div. 795, 128 N.Y.S.2d 326 (2d Dept.), aff'd, 307 N.Y. 784, 121 N.E.2d 618 (1954).

2. Incorporated Village of Laurel Hollow, Building Zone Ordinance, Art. X, § 10.1 (1961).

3. *Id.* § 10.2.

Johnson did not immediately identify himself and for some minutes had a friendly conversation with the employees, who apparently were under the impression that Johnson was a real estate broker. When this initial confusion was cleared up and Johnson's actual position revealed, the three employees asked him to leave, and Johnson complied. During this visit Johnson saw drying racks, cans of paint, rolls of paper and other materials which led him to believe that the Lavernes were violating the 1954 injunction and the Village ordinance.

Johnson reported what he had observed to the Village Board of Trustees. The Board considered the matter at its September 1962 meeting and, with the advice of the Village attorney, authorized Johnson and Hutchinson Dubosque, the Deputy Mayor of the Village, to make another inspection of the Laverne premises.

Howard Corning, the Mayor, subsequently decided to accompany them, and an inspection was carried out on October 18, 1962.[4] The inspection, which covered principally the main entry area of the premises, lasted some minutes until Estelle Laverne asked the officials to leave. Several photographs were taken, and the three men observed the same sort of materials Johnson had seen on his earlier visit.

On the basis of the evidence gathered during these inspections, the Village commenced contempt proceedings against the Lavernes for violating the 1954 injunction and a criminal action against Erwine Laverne for violating Village zoning ordinance. A contempt order was obtained, and this prompted another inspection by the Building Inspector on December 18, 1962, to see that the Lavernes were complying with the terms of the order. Subsequent to that time the Village sought another contempt order and instituted a suit seeking civil penalties for violations of the injunction.

Erwine Laverne was convicted of violating the Village ordinance. He received a six months' suspended jail sentence,[5] and his case came up before the New York Court of Appeals. In a 4–3 decision that court reversed the conviction on the ground that the various warrantless inspections of the Laverne premises violated the Fourth Amendment. *People v. Laverne*, 14 N.Y.2d 304, 251 N.Y.S.2d 452, 200 N.E.2d 441 (1964). The Court of Appeals found that the inspections were made for the purpose of obtaining evidence for a criminal prosecution and thereby distinguished *Frank v. Maryland*, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) (subsequently overruled in *Camera v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)), which had upheld warrantless inspections of dwellings for the purpose of administrative or civil enforcement of a city health code.

Following the decision in *People v. Laverne, supra*, the Appellate Division also reversed judgments in favor of the Village in the civil actions brought against the Lavernes. *Incorporated Village of Laurel Hollow v. Laverne Originals, Inc.*, 24 A.D.2d 615, 262 N.Y.S.2d 622 (2d Dept. 1965); *Incorporated Village of Laurel Hollow v. Laverne, Inc.*, 24 A.D.2d 616, 262 N.Y.S.2d 625 (2d Dept. 1965).

The plaintiffs brought this civil rights action to redress the violations of their constitutional rights found by the New York Courts to have occurred in connection with the inspections. They seek to recover approximately $26,000 in legal costs, as well as compensation for stress, trauma and emotional distress, and punitive damages. The case was initially assigned to Judge Tenney, who granted summary judgment in favor of the Lavernes on the issue of liability. He found that the defendants' good faith, if it existed, in conducting the inspections would provide no defense to the charges

---

4. Defendant Meehan of the Village police department also went along to identify the others as Village officials, but he did not actually enter the premises.

5. Why Laverne received a jail sentence is not specified in the record. Section 10.2 of the Village zoning ordinance appears to prescribe only fines as penalties for violations.

and therefore ruled that there were no material issues of fact to be tried.[6]

After this court's decision in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339 (2d Cir. 1972), holding that a good-faith and reasonable belief in the lawfulness of an arrest and search was a defense in a damage suit brought against federal agents pursuant to an implied right of action under the Fourth Amendment,[7] the defendants moved before Judge Tenney to vacate the earlier grant of partial summary judgment. By this time, the case had been assigned to a different judge, and Judge Tenney declined to vacate his previous order. He did, however, indicate that the new judge could, if he so desired, reexamine the issue or permit the issue of good faith to be tried to a jury.[8] Judge Knapp subsequently adopted the latter suggestion, and after a five-day trial a jury found that the defendants had acted with a good-faith and reasonable belief that the search was valid. In a subsequent memorandum opinion, Judge Knapp ruled that this finding was a complete defense to the action and therefore entered final judgment for the defendants.[9] From this judgment the plaintiffs have filed this appeal.

## I.

At this juncture in these proceedings, it is conceded that the inspections were unconstitutional at the time they were made, and therefore as noted at the outset of this opinion, the principal question presented is whether the defendants' good-faith belief in the lawfulness of the inspections provides a com-

plete defense in this lawsuit. We hold that it does.

Any discussion of the good-faith defense—more recently referred to by the Supreme Court as a "qualified immunity"—available to governmental officials in § 1983[10] actions for damages must start with the case of *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). There police officers had arrested the plaintiffs under a breach of the peace statute subsequently held unconstitutional by the Supreme Court in *Thomas v. Mississippi*, 380 U.S. 524, 85 S.Ct. 1327, 14 L.Ed.2d 265 (1965). The plaintiffs had initially been convicted before a police justice but in a trial *de novo* received a directed verdict of acquittal. The plaintiffs then brought a § 1983 damage action against, among others, the police officers who had arrested them. The complaint also alleged common law false arrest and imprisonment. The court of appeals decided that the police would be liable under § 1983 for an unconstitutional arrest even if they acted in good faith and with probable cause in making an arrest under a statute later held unconstitutional. The Supreme Court reversed on this issue, holding "that the defense of good faith and probable cause, which the Court of Appeals found available in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." 386 U.S. at 557, 87 S.Ct. at 1219. The Court observed that "a police officer [should not be] charged with predicting the future course of constitutional law." *Id.*

More recently in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), a § 1983 action against the Gov-

---

**6.** Judge Tenney's decision is reported at 316 F.Supp. 629.

**7.** Such a private right of action was found by the Supreme Court to exist in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**8.** Judge Tenney's order is reported at 354 F.Supp. 1402.

**9.** Judge Knapp's order is reported at 376 F.Supp. 836.

**10.** Although the complaint cites 42 U.S.C. §§ 1981–88, the parties have on this appeal treated it as an action brought solely under § 1983 and have advanced no reason why our consideration of the issues presented should differ from a case alleging only violations of § 1983.

ernor of Ohio and various personnel connected with the Ohio National Guard arising out of the May 1970 shootings at Kent State University, the Supreme Court held that a qualified immunity existed for the defendant governmental officials. The Court described the immunity essentially in terms of a good-faith defense:

> [I]n varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* at 247–48, 94 S.Ct. at 1692.

The most recent Supreme Court pronouncement in the area occurred this Term in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). There the Court upheld a good-faith immunity for school administrators and school board members charged with expelling the petitioners, high school students accused of "spiking" the punch at a meeting of a school extracurricular organization, without affording them due process of law.

The foregoing Supreme Court decisions clearly establish that at least in some cases a good-faith defense is available to governmental officials charged in § 1983 cases with violating the constitutional rights of plaintiffs. However, the Lavernes launch what is essentially a two-pronged argument that the defense should not be available in this case.

They argue first that this court should look to the closest common law tort analogue to determine whether a good-faith defense exists. Unlike *Pierson,* for example, where the cognate torts were false arrest and imprisonment where good faith is a defense, in this case, they urge, the closest tort law analogy is trespass. And while at common law governmental officials undeniably had a privilege to enter a landowner's property in the proper performance of their duties,[11] the plaintiffs contend that the officials were absolutely liable if the action was, as here, later determined to be unconstitutional or otherwise invalid. Even assuming, *dubitante,* the correctness[12] of this assertion, for several reasons we do not consider it to be dispositive of the availability of a good-faith defense in this action.

■ First of all, we are not persuaded that trespass is as close an analogy as the plaintiffs contend. The essence of the plaintiffs' claim is the right to be free of unlawful searches or seizures, and this goes beyond a person's interest in the exclusive possession and quiet enjoyment of land, which is the interest protected by the common law action for trespass.[13] And certainly the damages sought in this case differ markedly from the injury to property normally recoverable in a trespass action.[14] No monetary claim is brought for damage to land or injuries to persons occurring during the

---

11. F. Harper & F. James, The Law of Torts § 1.20 (1956); W. Prosser, The Law of Torts § 16 (4th ed. 1971).

12. *See Baggott v. Linder,* 208 Ga. 590, 68 S.E.2d 469 (1952); F. Harper & F. James, *supra* note 11, § 1.4 at 13; Restatement (Second) of Torts § 164, comments *a* and *e. But see* W. Prosser, *supra* note 11, §§ 25, 132, at 128, 991.

13. *See* F. Harper & F. James, *supra* note 11, at § 1.1. Judge Tenney recognized the difference in applying to this case New York's six-year statute of limitations for liability created by statute rather than the three-year period for injury to property. 316 F.Supp. at 634–35.

14. In addition to compensation for damage to his property, a plaintiff in a common law trespass action can recover for injury to person including unforeseen mental distress. *See* W. Prosser, *supra* note 11, § 13 at 67–68 (4th ed. 1971).

inspections. Any damages resulted more from the necessity of defending the subsequent legal actions brought by the Village against the Lavernes. Furthermore, while the Supreme Court has sanctioned analogies to the common law in § 1983 actions where appropriate, *e. g. Pierson v. Ray, supra*, 386 U.S. at 557, 87 S.Ct. 1213; *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492, (1961),[15] "the common law is not an infallible guide." *Tucker v. Maher*, 497 F.2d 1309, 1314 (2d Cir. 1974), *citing, Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 231–33, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (separate opinion of Justice Brennan).[16] And, most importantly, the considerations which prompted the Supreme Court to find a qualified immunity in *Scheuer v. Rhodes, supra*, and *Wood y. Strickland, supra*, dictate that the same defense should be available here. The qualified immunity is based on the common-sense rationale that the public interest requires that public officials be able to carry out their discretionary duties and act decisively without the intimidation that would result if good-faith errors in judgment were later to subject them to liability for damages:

> Public officials, whether Governors, Mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide to or act at all.

*Scheuer v. Rhodes, supra*, 416 U.S. at 241–42, 94 S.Ct. at 1689 (footnote omit-

ted), *quoted in, Wood v. Strickland, supra*, 420 U.S. at 308, 95 S.Ct. 992. The defendants in this case were faced with what appeared to be a violation of a Village zoning ordinance which it was their duty to enforce. That their actions would later be declared unconstitutional by the New York Court of Appeals was, as determined by the jury, not an event which they could reasonably foresee, and they should not be subjected to damage liability because they were not omniscient predictors of the uncertain course of constitutional law. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra*, 456 F.2d at 1348; *see Pierson v. Ray, supra*, 386 U.S. at 555, 87 S.Ct. 1213.

The remaining prong of the plaintiffs' argument can be disposed of quickly. They seek to distinguish *Pierson, Scheuer, Wood*, and *Bivens* on the ground that those cases involved officials required under the circumstances to think and act quickly. In *Pierson* and *Bivens* law enforcement officers, who often do not have time to reflect before making an arrest, were involved. In *Scheuer*, the executive officials were confronted with what appeared to them to be an immediate threat to public order. And the Supreme Court in *Wood* emphasized that school officials often have a need for prompt action when faced with student behavior threatening disruption. 420 U.S. at 308, 95 S.Ct. 992. In contrast, the Lavernes posed no immediate threat to the public safety, and in fact neither the Building Inspector nor the Board of Trustees acted with great promptness. However, we do not think this distinction advanced by the plaintiffs withstands scrutiny. *Wood*, despite language in the opinion, was not a case in which school officials were under pressure to make an immediate decision. The students responsible for spiking the punch were first questioned

---

15. *See also, e. g., Pritchard v. Perry*, 508 F.2d 423 (4th Cir. 1975); *Hill v. Rowland*, 474 F.2d 1374 (4th Cir. 1973); *Rodriguez v. Jones*, 473 F.2d 599 (5th Cir.), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973).

16. Although not discussing the issue raised in this appeal, this court has upheld a good-faith defense in a § 1983 action against police officers that was in many respects similar to a trespass suit. *Anderson v. DeCristofalo*, 494 F.2d 321 (2d Cir. 1974) (per curiam).

about it ten days later. A meeting of the school board was held that night, but another meeting to consider the matter was held two weeks later. 420 U.S. at 308, 95 S.Ct. 992. Nevertheless, the Court held that the school officials had a qualified immunity. Likewise, the Village officials involved in this case undoubtedly in some circumstances are faced with the need for prompt action. The fact that particular circumstances in this case did not call for quick decision does not abolish the immunity altogether. See, for example, *Tucker v. Maher*, 497 F.2d 1309, 1313 (2d Cir. 1974), in which this court upheld the good-faith defense of a deputy sheriff who performed the purely ministerial act of serving a writ of attachment. The speed with which the officials were required to act is rather an ingredient for consideration by the jury in determining the reasonableness of the good-faith belief in the lawfulness of the action taken. *See Scheuer v. Rhodes, supra*, 416 U.S. at 247–48, 94 S.Ct. 1683. The jury in this case was properly instructed by the district court that good faith has both a subjective and an objective element. Not only must the defendants have acted believing that the inspections were lawful but also this belief must have been a reasonable one in light of the circumstances. This instruction allowed for consideration of the timing of the events in question.

## II.

■ The remaining points raised on appeal merit only brief comment. The plaintiffs-appellants argue that the defendants are collaterally estopped from raising the issue of good faith since the New York Court of Appeals in *People v. Laverne, supra*, determined that the inspections were unlawful at the time they were made. The short answer to this contention is that *People v. Laverne*, being a criminal case, dealt with an entirely different issue, namely, whether the inspections were lawful in fact. Questions of good faith were irrelevant, and the case did not touch upon them.

■ Plaintiffs next contend that the evidence was insufficient to make out a good-faith defense, particularly with respect to the Mayor and Deputy Mayor, who accompanied the Building Inspector on October 18, 1962. This contention is equally without merit. The defendants presented an expert witness, Professor Norman Dorsen of New York University Law School, who testified extensively about the state of the law as it existed in 1962. Through his testimony the jury was apprised of the Supreme Court decision in *Frank v. Maryland, supra*, upholding administrative searches, and that case was contrasted with the New York Court of Appeals' 1964 holding in *People v. Laverne, supra*. It was Professor Dorsen's opinion—based on the existence of the ordinance authorizing entries by the building inspector, Supreme Court decisions existing at the time, and the fact that the Village attorney had advised that the entry could take place— that "there was reasonable ground for belief that the entries were lawful at the time they took place in 1962." (Tr. 294). Speaking with particular reference to the Mayor and Deputy Mayor, whose duty it was to see that the laws were enforced,[17] Professor Dorsen also expressed the opinion that it was reasonable for them to go along to advance or support what the Building Inspector was doing. (Tr. 298). This testimony was sufficient to support the jury's verdict.

■ Toward the end of its deliberations, the jury submitted the following question to the trial judge: "The fact that the building inspector invited the architect to go on the premises and

---

17. Section 80 of New York's Village Law, McKinney's Consol.Laws, c. 64 in effect in 1962 defined a mayor's duty in part as to see that "the resolutions and ordinances of the board of trustees are enforced." The Village Mayor testified that he was aware of his duty and that he was acting pursuant to it. Tr. 189–90.

failed to identify himself as soon as possible, is this pertinent to the decision?" The judge's answer to this question is set out in the margin.[18] The appellants object that the answer was not responsive in that it did not refer specifically to the question of whether the Building Inspector was giving a "tour" for his friend or performing an official inspection. However, the question was not clearly a bifurcated one, as the plaintiffs contend, and the concern of the jury seems to have been whether the Building Inspector was attempting to conceal his purpose. Consequently, we think that the judge's answer very adequately touched all bases. It mentioned the architect and made it clear that the motive of the Building Inspector was the important factor for the jury to consider.

■ The final point raised by the appellants relates to the judge's refusal to admit evidence describing the Lavernes'

factory in Long Island City. The object of the proof was to show that the Lavernes were simply using their home as a studio and that on the basis of what the defendants observed, they could not have reasonably believed that the ordinance was being violated. The judge excluded the evidence on the ground that it was "irrelevant what a factory does unless you can show that the defendant knew it." (Tr. 452). We wholly concur in this ruling. The defendants were not familiar with the work of designers. The reasonableness of their characterization of activities on the Laverne premises was to be determined on the basis of the common understanding of individuals in like circumstances, and not with reference to the conceptions of persons engaged in the business.

For the foregoing reasons, we find no merit in the points raised by the appellants, and therefore affirm the judgment of the district court.

---

18. Like most questions of that kind, the answer is, it all depends. It depends on what your judgment is as to his reason for not identifying himself sooner. As I recollect his version of the testimony, and I guess there is no other version, his version of the testimony of that (sic) he had been passing the place on several other occasions after this conversation with the neighbor, Martin, I think the neighbor's name was, his conversation with Mr. Martin and he had looked at the premises and seeing nothing, the doors locked and no way to clarify one way or another this complaint. And that on this occasion, having been a storm, he rode by and he saw the door open and thought this would be a good opportunity to check out his complaint, and he went in.

And, as you recollect, of course, the fact that I remember the testimony this way obviously is not controlling. As I remember it, he looked around for somebody to talk to and found nobody, and all of a sudden, heard some sort of sound or a light, or something—I can't remember the details—and found these men working, and immediately began to commiserate with them and then walked back towards the main part of the house; and at one point Rudy said to

him, "are you the broker?", and he said "No, I'm the building inspector." And I don't know that he ever identified his architect friend. I'm not even sure where the architect friend was at that point. And then they had the conversation. And then he said, "if you are the building inspector, go out."

If you come to the conclusion that he did that to conceal his status for some ulterior motive in order to disarm or deceive Rudy, why, then, I should think that would be most significant bearing on your judgment whether he was acting in good faith.

But, on the other hand, if you come to the conclusion that he just saw the opportunity to effect the inspection and didn't really think one way or another whether it would be objected to or wouldn't, he just walked in and began talking about the first thing that seemed important at that instant, which is the problem that they were having, and just didn't identify himself because it didn't occur to him that it was necessary until the question of who he was had arisen, and he said, "No, I'm the building inspector," if that is your conclusion, I would think it would have minimum, if any, pertinence to the decision.