**Joe REIMER, Plaintiff-Appellant,**

v.

**Herman SHORT, Chief of Police, et al., Defendants-Appellees.**

No. 75–1428.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1978.

Rehearing Denied Oct. 18, 1978.

Joe Reimer, pro se.

Joseph G. Rollins, Sr. Asst. City Atty., Roy F. Martin, III, Asst. City Atty., Houston, Tex., for defendants-appellees.

Before JONES, WISDOM and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge:

Joe Reimer, the proprietor of an auto salvage business in Channelview, Texas, appearing pro se, brought this suit under 42 U.S.C. §§ 1981, 1982, 1983, and 1985 against the City of Houston, Houston's Chief of Police (Short), and two members of the Houston Police Department, Officers Adams and DeFoor. He alleges that during the summer of 1973, he was the victim of police harassment, unlawful searches of his business premises, and unlawful searches and seizure of his pickup truck. After the City of Houston and Police Chief Short were dismissed as defendants, the first trial of Reimer's civil rights action against Officers Adams and DeFoor ended in a mistrial before a deadlocked jury. At the second trial, the jury found for the defendant officers, and the district court entered judgment accordingly. On this appeal, Reimer raises eleven claims of error but essentially seeks three things: (1) the reversal of the jury's verdict for the defendant policemen in the civil rights action, (2) the reinstatement of the City of Houston and Police Chief Short as defendants, and (3) the reversal of a state conviction for theft of the pickup truck. Reimer's vigorous pro se advocacy has borne some fruit. We reverse the jury verdict as to some of the actions of the defendant police officers, but affirm the district court on all other points.[1]

I

Reimer alleges that during the period from June 19, 1973 to September 10, 1973, Adams and DeFoor came to his salvage lot at least ten times to inventory the vehicles in his possession and check for stolen merchandise. All visits were made without warrants. Although the police officers contend that the searches were made with Reimer's consent, Reimer asserts that he never consented to them. He contends that the officers interfered with his business by telling customers they had "closed" the lot and circulating rumors that Reimer was selling stolen vehicles.

At about 3:00 A.M. on September 10, 1973, Adams noticed a truck bearing the license plate FK 9100 parked on the street. He remembered seeing that license number a few weeks earlier on a wrecked truck. Upon checking with state authorities, he learned that the license plate should have been on a truck with a vehicle identification number (VIN) different from that on the parked truck. He set up a surveillance and impounded the truck when one Elton Brown, who had borrowed the truck from Reimer, attempted to drive it away. Later, Adams and DeFoor and others conducted a thorough inspection of the truck, disassembling it in a search for identification numbers. The officers did not obtain a warrant for either the seizure of the truck or the search while it was in police custody.

Reimer argued that the truck in question was his, having been reconstructed from three vehicles: a blue 1968 Ford, a green 1972 Ford (VIN F10GKP62670, with license FK 9100), and a red and white 1970 Ford

1. This case was argued on November 4, 1976. Reimer initially submitted only a partial transcript of the second trial. Because consideration of his contention that the evidence was insufficient to support a jury verdict required consideration of all the evidence, F.R.App.P. 10, we requested him to supplement the record. We granted Reimer several extensions because the court stenographer proved unable or was unwilling to provide a complete transcript. After Reimer filed a motion to show cause why the court reporter should not be held in contempt of this Court, the reporter completed the supplemental transcript, which was filed more than a year after the case was argued.

(VIN F10GKH11749). He had documentation of title for the latter two vehicles and maintained that under Texas law the FK 9100 license plate was the authorized one for the hybrid truck. His only proof of title with regard to the body portion of the vehicle was his own testimony that he once had the certificate of title but no longer had it because the police officers had taken it and were withholding it. The police maintained that except for the frame and a few other parts of the hybrid truck, the vehicle was a truck that was stolen from one John Hubbard. Hubbard identified the truck by informing the police of several minor details about it that only its owner would have known. Reimer asserts that this identification was the product of a conspiracy between the police and Hubbard and that another man has since been convicted for the theft of Hubbard's truck.

After the police filed charges against Reimer, but before his arrest and indictment, Reimer brought this civil rights action. On October 26, 1973, he filed a "Motion for the Return of the Seized Property and the Suppression of Evidence", which was granted in a default judgment entered January 7, 1974 "insofar as it refers to one 1970 Ford pick-up truck with serial numbers F10GKH11749 and F10GKP62670". Reimer made much of this default judgment, even convincing a state judge at one point that it constituted an order binding the state court to suppress evidence of the truck in state criminal proceedings against him. A later amendment of the minute entry covering the judgment and a qualification in the minute entry itself make clear that the order, properly construed, was *only* an order directing the police to return the truck to Reimer. The proceeding was not an adjudication of Reimer's title to the truck nor a determination that the seizure and suppression claims were valid.

Despite the January 7, 1974 order to return the truck, the police did not return it until January 18, 1974 and returned it then only after Reimer filed a motion to show cause why they should not be held in contempt. The police returned the truck but retained its identification plate, making

Reimer's possession of the truck technically illegal. The defendants finally returned this plate on August 23, 1974, in response to a second contempt motion Reimer filed. After returning the plate, however, the defendants placed a "stop" on the title of the truck, preventing the vehicle from being transferred. Reimer challenged this action with a third contempt motion, but that motion was denied.

After the conclusion of Reimer's civil rights action against the police, the state tried its auto theft charges against him. On March 25, 1975, a jury convicted Reimer of the theft of the Ford pickup truck. The Texas Court of Criminal Appeals, however, granted him a new trial on September 23, 1975, because of newly discovered evidence. Weary, so Reimer says, of his battle against "City Hall" and the Houston Police Department, on March 1, 1976, he entered a plea of nolo contendere to a charge of misdemeanor auto theft. He received a thirty-day sentence. In addition to seeking a reversal of the judgment in his civil rights action, Reimer also challenges the disposition of the state criminal case against him on this appeal.

## II

■ We dispose of the challenge to the nolo contendere plea first. Reimer is attempting to challenge his plea of nolo contendere to a state criminal charge through an appeal of a federal civil rights action. This he cannot do. First, and most obviously, Reimer has never challenged the disposition of the state criminal charges in a federal district court, so there is no lower court order regarding the matter on which an appeal could be based. Consequently, this matter is not properly before us on appeal. Second, although Reimer's plea was one of nolo contendere rather than guilty, he is still challenging the fact or length of his confinement. The relief sought is thus habeas corpus in nature, and under *Preiser v. Rodriguez*, 1973, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439, Reimer must exhaust adequate state remedies before bringing suit

for relief from his nolo contendere plea in federal district court.

■ We next reach Reimer's contention that the district court erred in dismissing Police Chief Short and the City of Houston as defendant parties in the civil rights suit. The district court did not err in granting Police Chief Short's motion to dismiss him as a defendant after the conclusion of the plaintiff's case at the first trial. "[T]here is no evidence that he participated in, had knowledge of, or was negligent with regard to the actions of the [policemen which were the subject of Reimer's complaint]".[2] *Anderson v. Nosser*, 5 Cir. 1971, 438 F.2d 183,

199, modified on other grounds, 456 F.2d 835 (en banc), *cert. denied*, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1973). As this Court noted in *Anderson, quoting Jordan v. Kelly*, 1963, W.D.Mo., 223 F.Supp. 731, 739: "The chief of police would not be responsible for the wrongful acts of the officer unless he was present or unless it is shown he directed such acts or personally cooperated in them . . .." 438 F.2d at 199.

■ As to the City of Houston, the district court applied *Monroe v. Pape*, 1961, 365 U.S. 167, 187–92, 81 S.Ct. 473, 5 L.Ed.2d 492, and found that the City of Houston was not "a person" for the purposes of

---

2. The only evidence of Short's involvement in the acts that gave rise to Reimer's civil rights suit was the following testimony given by Reimer at the first trial.

Q During this period when you were trying to locate your automobile at the Houston Police Department, did you ever have any conversation with a man who was then Chief of Police, Mr. Herman Short?
A No.
Q Did you make any efforts to see Mr. Short?
A Yes.
Q What did you do?
A I went up there.
Q Went up where?
A To the police department, which was located on Riesner Street. There was a gentleman down below that little desk, kind of like an information center. I asked him what I to do do to see Chief Short.
Q When was this, if you recall?
A This was before they had seized the truck, but I couldn't put an exact date on it.
Q This was before they seized the truck?
A Yes, sir.
Q Well, why were you going to see Chief Short at that time?
A I wanted him to stop all this harrassment, these officers just coming out there and shaking my yard down all the time.
Q All right. And did you get to see him?
A I waited out in the hall. He wouldn't see no one. I waited out in the hall till—it was a little after noon. He came out in the hall with four or five other people that was along with him and I just broke into the line and told him everything.
Q What did you tell him?
A I told him I wanted all this stuff stopped, I was sick and tired of all this harrassment. I wanted these things stopped. These officers were outside the city limits of Houston. He told me, "I'm sure if my men are out there, they've got a good reason and I'm not going to do anything about it."

Q And that was the extent of your conversation with Chief Short?
A That was it because he kept walking.
Q Did you ever have any other conversations with him, write him any letters, or anything?
A I did not.

. . . . .

Q And can you tell us a little about this conversation with Chief Short? You say that this was around noon?
A It was at noontime, yes, sir.
Q And he was surrounded by several people or walking with a group of men?
A Yes, sir.
Q And you said said that you kind of broke into the crowd?
A Yes.

. . . . .

Q And that was the only conversation you had with Chief Short?
A That is it, yes.
Q All right, sir. And what did you tell him, now?
A I asked him why I was being harrassed and requested that this harrassment and illegal seizures and searches of my property be stopped.
Q Did you explain what it was about?
A No, because he just kept walking. I didn't have time.
Q You just used the word, harrassed, and didn't say Adams or DeFoor were coming on your property?
A I believe their names were mentioned to him, but I couldn't truthfully tell you that, Counsel.
Q All right. And you didn't explain about the automobiles or anything like that?
A No, sir.

Second Supplemental Record on Appeal, Testimony of Joe Reimer at 46–48, 90–92.

§ 1983. Although the court was correct at the time, the Supreme Court has since overruled that holding of *Monroe. Monell v. Department of Social Services of the City of New York* (1978), —— U.S. ——, 98 S.Ct. 2018, 56 L.Ed.2d 611. The Supreme Court did not find cities liable to the same extent as any other employer.

"On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."

—— U.S. at ——, 98 S.Ct. at 2036. As with Chief Short, there is no evidence that the City of Houston "acted" through its policies, formally or informally adopted, to deprive Reimer of his constitutional rights. Thus, because the only theory under which the City of Houston could be held liable is *respondeat superior*, the action was properly dismissed as to the City.

### III

■ We turn finally to Reimer's request that the jury's verdict for defendant officers Adams and DeFoor be reversed. Although he raises numerous claims of error as to the proceedings below, Reimer primarily asserts two grounds for overturning the jury's verdict: an improper charge to the jury and insufficiency of the evidence.

The district court instructed the jury that even if you find by a preponderance of the evidence that the plaintiff's civil rights have been violated in this case, should you find, by a preponderance of the evidence, that the defendants were at all times acting in good faith with a

reasonable belief in the validity of their conduct, then you must find for the defendants.

Under this instruction, the defendant policemen could avail themselves of an affirmative defense of good faith only if two criteria—one subjective and one objective— were met. First, the defendant police officers had to show that they subjectively harbored a good faith belief that their actions were lawful; second, the objective circumstances surrounding their actions must have been such that their subjective good faith was reasonable. The court's instruction is a correct statement of the law. This can best be shown by discussing the applicability of the "good faith-reasonable belief" defense to the searches of the auto salvage yard and the impoundment of the truck separately.

The availability of a good faith defense to police officers defending § 1983 actions premised on allegedly illegal searches and seizures was first announced by the Supreme Court in *Pierson v. Ray,* 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 228. The Court there held that where the police activity complained of involved an arrest, "the defense of *good faith and probable cause . . .* available to the officers in the common-law action for false arrest and imprisonment, is also available to them in [an] action under § 1983". (Emphasis added.) *Cf. Procunier v. Navarette,* 1978, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (extending a good faith defense to prison officials).[3] Subsequently, several courts of appeals, led by the Second Circuit in *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 2 Cir. 1972, 456 F.2d 1339, on remand, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, decided that the probable cause requirement of a police officer's good faith defense to a § 1983 action is not the same as the probable cause that is constitutionally required to validate searches and

---

**3.** In *Procunier* the Supreme Court categorized the two branches of good faith immunity as requiring the plaintiff to prove either that the defendant knew or should have known that he was violating the plaintiff's rights, or that the defendant acted with some malicious intention. Although that statement is phrased differently from our Court's objective/subjective standard, the substantive differences, if any, are not relevant to this case.

seizures in a criminal proceeding.[4] *Hill v. Rowland*, 4 Cir. 1973, 474 F.2d 1374; *Jones v. Perrigan*, 6 Cir. 1972, 459 F.2d 81. These Courts held that in a § 1983 action against a police officer based upon searches and seizures he committed in the circumstances of an arrest, "it is a defense to allege and prove *good faith and reasonable belief* in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted". *Bivens v. Six Unknown Agents*, 456 F.2d at 1348 (emphasis added); *Hill v. Rowland*, 474 F.2d at 1377; *Jones v. Perrigan*, 459 F.2d at 83.

Because the searches by Adams and DeFoor of Reimer's auto yard were not incident to any arrest, *Bivens* and the cases approving it are not directly applicable. In *Laverne v. Corning*, 2 Cir. 1975, 522 F.2d 1144, however, the court held that the "good faith-reasonable belief" defense is available to public officials sued under § 1983 for performing searches not directly incident to an arrest. In *Laverne*, the Mayor, Deputy Mayor, Building Inspector, and other officials of Laurel Hollow, Long Island were sued under the Civil Rights statutes for performing a series of searches of the plaintiff's property that led to a criminal prosecution for violating both the Village zoning ordinance and a previously obtained injunction. The plaintiffs advanced two reasons for distinguishing prior cases including *Wood v. Strickland*, 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 and *Scheuer v. Rhodes*, 1974, 416 U.S. 232, 94 S.Ct. 1038, 40 L.Ed.2d 90, upholding the "good faith-reasonable belief" defense to suits based on official acts. First, they urged that *Pierson* and *Monroe v. Pape*, 1961, 365 U.S. 167, 187,

81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505, require that § 1983 "be read against the background of tort liability", and good faith is not a defense to the closest common law tort analogue—trespass. Second, they argued that *Wood, Scheuer, Pierson*, and *Bivens* all involved officials required under the circumstances to think and act quickly. The *Laverne* Court rejected both arguments. Although the defendants in *Laverne* were executive officials of a locality rather than policemen, they were sued for performing investigatory activities routinely performed by police officer. We agree with the Second Circuit that a police officer's reasonable good faith belief that his actions are lawful and within the scope of his authority is an affirmative defense to a § 1983 action based on searches performed by the policeman not directly incident to an arrest. Indeed, a contrary holding might encourage policemen to arrest first and search later in a misguided attempt to avoid civil liability. Furthermore, the approval of the "good faith-reasonable belief" defense to non-arrest § 1983 actions against policemen that we make explicit today was implicit in our decision in *Rodriguez v. Jones*, 5 Cir. 1973, 473 F.2d 599. *See also Fisher v. Volz*, 3 Cir. 1974, 496 F.2d 333, 348 n.27.

With respect to § 1983 actions premised on the seizure and retention of personal property by the police—such as the prolonged impoundment of Reimer's truck by Adams and DeFoor here—our *en banc* decision in *Bryan v. Jones*, 5 Cir. 1976, 530 F.2d 1210, requires that police officers be permitted a reasonable good faith defense. In *Bryan*, we held that when a plaintiff sues his jailer under § 1983 for keeping him illegally imprisoned, "a defense of official

4. The district court charged the jury to this effect:

In considering whether or not the defendants are liable to the plaintiff in this case, you are asked to determine whether or not the defendants acted in good faith with a reasonable belief in the validity of their acts. A policeman or other official may commit a variety of acts which in the course of a criminal trial might be found to be in violation of the civil rights of the accused person. In a civil case in which a policeman is sued for

damages, however, he will not be held to the same standard to which he is held in a criminal case. He is not expected to predict whether or not a judge will hold as a matter of law that he did not have "probable cause" to act as he did under the circumstances. Rather, he will have a complete defense to his actions if he can show that, under the circumstances and acting as an ordinary and prudent policeman, he acted in good faith and it was reasonable for him to have believed that his actions were lawful.

immunity is available to a jailer who has acted in reasonable good faith". 530 F.2d at 1214. Although it is questionable whether the common law affords a police officer who has committed a trespass to a chattel or a conversion the defense of reasonable good faith, we permitted the reasonable good faith defense in *Bryan*.[5] It would be anomalous to allow a reasonable good faith defense to an official responsible for depriving a plaintiff of his personal liberty and not avail that defense to one responsible for depriving an individual of his personal property. The district court properly instructed the jury on the police officer's good faith defense to both the search and the impoundment.

■ Reimer argues that the evidence was insufficient to support the jury's conclusion that the officers acted in good faith. We can reverse the jury's verdict only if the district court erred in not granting Reimer's motions for a directed verdict and for judgment notwithstanding the verdict. 5 Moore's Federal Practice ¶ 38.08[5], at 89. The standard for granting these motions was set out by this Court in *Boeing Company v. Shipman*, 5 Cir. 1969, 411 F.2d 365 (en banc).

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the mo-

tions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for a jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

411 F.2d at 374–75.

■ After reviewing the record, we conclude that, for most of Reimer's claims, this is not a case in which "the facts and inferences point so strongly and overwhelmingly in favor of one party that . . . reasonable men could not arrive at a contrary verdict . . . ." The parties introduced directly conflicting evidence concerning the frequency, intrusiveness, and consensual nature of the officers' searches of Reimer's yard. A reasonable jury could have held for the officers, not only on the issue of good faith but on the question whether any violation at all had occurred. Similarly, the evidence presented shows that the officers could well have believed the truck to have been stolen, and was contraband, when they seized it in September 1973.

■ On one point, however, the jury did exceed the bounds of reason. The defendants' actions after January 7, 1974, cannot be said to have been in good faith. On October 26, 1973, Reimer filed a motion in federal court for return of his truck. The district court granted this motion on Janu-

---

5. Section 265 of the Restatement (Second) of Torts (1965), for example, provides:

One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting to discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority.

Comment (a) to § 265, however, explains: It is beyond the scope of this Restatement to state when an officer . . . is under a duty to act, or is authorized to act. Particular statutes may authorize him to act when he reasonably believes it to be necessary. Other statutes may be construed to give the authority only when there is actual necessity. If he is found to be authorized, the rule stated in this Section applies.

ary 7. Reimer took the order granting his motion to the police department the next morning. There he was told that "they couldn't read the Judge's signature" and therefore were not going to honor it. After asking for time to consult the City Attorney, the defendants made Reimer wait in the hall for five hours. A Mr. Storemski finally told Reimer that afternoon that they were not going to release his truck. Ten days later, and only after Reimer served the defendants with a motion to show cause why they should not be held in contempt, the truck was released. Third Supp. Record, 222–28. Even then, the police would not release to Reimer the vehicle's identification plate. This made possession of the truck by Reimer technically illegal. The plate was not returned until August 23, 1974, the scheduled date of argument on Reimer's second contempt motion concerning that plate. His possession of the truck was still uncertain, for the defendants put a "stop" on the title to the truck, preventing it from being transferred.

From the record, it seems clear that Officers Adams and DeFoor decided Reimer had stolen the truck, then set out to prove it. Until confronted with a court order, the jury could reasonably find that they had acted in good faith, subjectively and objectively. After that order was served, while their actions may still have been from good motives, that good faith could not have been reasonable. All the evidence leads to the conclusion that this continued barrier to Reimer's possession of the truck was an unreasonable deprivation of his property.

### IV

Except for the deprivation of property after January 8, 1973, the judgment below is AFFIRMED. With respect to the actions after that date, the judgment is REVERSED and the case is REMANDED for determination of damages.

JONES, Circuit Judge, dissenting:

The question of the good faith of the officers should be, I think, submitted to a jury.

I dissent.